UNITED STATES of America,
Plaintiff–Appellee,

v.

William TARPLEY, Defendant–
Appellant.

No. 91–1043.

United States Court of Appeals,
Fifth Circuit.

Oct. 8, 1991.

Rehearing Denied Nov. 5, 1991.

A.W. SoRelle, III (Court-appointed), Underwood, Wilson, Berry & Stein & Johnson, Amarillo, Tex., for defendant-appellant.

Dennis J. Dimsey, Susan D. Carle, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before POLITZ and HIGGINBOTHAM, Circuit Judges, and BUNTON,[1] District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A deputy sheriff appeals his conviction for violations of 18 U.S.C. §§ 241 and 242, which prohibit the deprivation of rights secured by the Constitution and laws of the United States under color of law. We find sufficient evidence to show that the defendant acted under color of law and conspired with another in doing so, and affirm.

I.

This is what happened, in the light most favorable to the government. In 1988, William Tarpley, deputy, Collingsworth County Sheriff's police force, learned of a past affair of his wife, Kathryn and Kerry Lee Vestal. Tarpley devised a plan to lure Vestal to the Tarpley home for the purpose of assaulting him.

Tarpley had his wife call Vestal and tell him that she had separated from her hus-

---

1. Chief Judge of the Western District of Texas, sitting by designation.

band and that she wanted him to come pick her up. On the day that Vestal was to arrive, Tarpley and another deputy, Michael Pena, made a pair of "sap gloves" in his office at the sheriff's station. These are gloves with rubber hosing filled with metal or lead shot attached to the fingers. Tarpley told Pena that he planned to have his wife call her boyfriend over and then use the sap gloves on him.

That evening, Tarpley parked his patrol car behind the house of another deputy so as not to alert Vestal that he was at home. When Vestal arrived at the Tarpley residence, Mrs. Tarpley opened the door and pulled him into the house. Mr. Tarpley immediately tackled Vestal and hit him repeatedly in the head. He also inserted his service pistol in Vestal's mouth. He told Vestal that he was a sergeant on the police department, that he would and should kill Vestal, and that he could get away with it because he was a cop. He repeated "I'll kill you. I'm a cop. I can." As he continued to beat and threaten Vestal, Mrs. Tarpley may have been taking pictures of the encounter. Tarpley then had his wife telephone the sheriff's station and ask Pena to come to their house. She did, and when Pena arrived, Tarpley introduced him to Vestal as a fellow sergeant from the police department. Pena confirmed Tarpley's claims that Tarpley had shot people in the past.

Eventually, Tarpley let Vestal go, chasing him out of the house with threats to kill him if he reported the incident. Pena then gave Vestal his keys, and Vestal drove away, but not before Tarpley smashed the headlights on Vestal's truck. Pena and the Tarpleys followed Vestal in Pena's squad car until Vestal had left town. Pena also apparently radioed for another officer to meet up with them and that police car also followed Vestal to the edge of town.

A federal grand jury indicted Tarpley and Pena and "another individual known to the grand jury" for conspiracy to injure and oppress Vestal in the exercise of his constitutional rights, as well as willfully subjecting Vestal to a deprivation of his constitutional rights, in violation of 18 U.S.C. §§ 241 and 242. Jointly tried, Pena was acquitted on both counts and Tarpley was convicted on both counts.

Defense counsel later learned that during the trial one of the jurors spoke with the juror's daughter, a legal secretary, about the difficulty he had understanding the nature of a conspiracy charge. There was also evidence that the juror's daughter had in turn contacted a lawyer about the matter. The district court held a hearing concerning these events at which both the lawyer and the juror's daughter testified. The court determined that no extrinsic evidence had reached the jury and that further investigation was not required.

Tarpley now appeals his conviction to this court.

## II.

Tarpley was convicted of violating two statutes, both of which require that an individual act "under color of law." 18 U.S.C. §§ 241 and 242.[2] Tarpley argues that the jury's finding that he acted "under color of law" was insufficiently supported by the evidence produced at trial. In reviewing the sufficiency of the evidence,

2. 18 U.S.C. § 242 provides in relevant part that "[w]hoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities, secured or protected by the Constitution or laws of the United States ... shall be fined not more than $1,000 or imprisoned· not more than one year, or both." 18 U.S.C. § 241 provides in relevant part that "[i]f two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States ... they shall be fined not more than $10,000 or imprisoned not more than ten years, or both." Although the latter provision does not contain the words "under color of law," proof of state action is necessary whenever it is an essential element of a constitutional violation.

this court "must view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt." *United States v. Berisha*, 925 F.2d 791, 795 (5th Cir.1991).

The Supreme Court has in two famous cases explained the concept of "under color of law." In *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941), the court stated that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." In *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1944), the court reaffirmed the *Classic* formula and stated more simply that "under 'color' of law means under 'pretense' of law." The court in *Screws* also observed that "[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." *Id.* However, "acts of officers in the ambit of their personal pursuits are plainly excluded."

■ This court and other courts of appeals have made clear that whether a police officer is acting under color of law does not depend on duty status at the time of the alleged violation. *Delcambre v. Delcambre*, 635 F.2d 407 (5th Cir.1981) (per curiam); *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir.1980). Nor does *Screws* mean that if officials act for purely personal reasons, they necessarily fail to act "under color of law." *Brown v. Miller*, 631 F.2d 408 (5th Cir.1980); *United States v. Davila*, 704 F.2d 749 (5th Cir.1983). Rather, *Screws* held simply that individuals pursuing private aims *and* not acting by virtue of state authority are not acting under color of law purely because they are state officers. *Brown*, 631 F.2d at 411.

■ Tarpley argues that there is no evidence that he "misused power possessed by virtue of state law" or that his actions were "made possible only because" he was "clothed with state authority." According to Tarpley, he was acting as a jealous husband, not as a police officer. He assaulted Vestal in his own home under circumstances in which it was clear that the motive for his attack was the extra-marital affair. That he told Vestal that he was a police officer, the argument continues, does not suggest that he was purporting to act under official authority. He never threatened to arrest Vestal. Vestal already knew he was a cop.

We are not persuaded. There was sufficient evidence in the record from which a rational juror could conclude that Tarpley was acting under color of law. Tarpley did more than simply use his service weapon and identify himself as a police officer. At several points during his assault of Vestal, he claimed to have special authority for his actions by virtue of his official status. He claimed that he could kill Vestal because he was an officer of the law. Significantly, Tarpley summoned another police officer from the sheriff's station and identified him as a fellow officer and ally. The men then proceeded to run Vestal out of town in their squad car. The presence of police and the air of official authority pervaded the entire incident. Under these circumstances, we are unwilling to say that no rational juror could find that Tarpley acted under color of law.

### III.

■ The defendant also contends that he cannot be convicted on the conspiracy count after his alleged co-conspirator, Pena, was acquitted in the same proceeding. He cites *United States v. Klein*, 560 F.2d 1236, 1242 (5th Cir.1977), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978), for the proposition that the conviction of only one defendant in a conspiracy prosecution will not be upheld if all other alleged co-conspirators are acquitted. Although this has long been the rule in this

Circuit, see, e.g., Herman v. United States, 289 F.2d 362, 368 (5th Cir.1961); United States v. Sheikh, 654 F.2d 1057, 1062 (5th Cir.1981), its continuing validity has recently come into question.[3]

We need not address this issue in this case, however, because there was a third potential co-conspirator not acquitted. The indictment alleged that "Tarpley and Pena, and another individual known to the grand jury, conspired to injure, threaten, oppress, and intimidate Kerry Vestal." The evidence is sufficient to support a conspiracy between Tarpley and this other individual, namely his wife. Mrs. Tarpley phoned Vestal and convinced him to come to the Tarpley home. She pulled Vestal into the house and apparently took pictures while her husband beat him. She contacted Pena at her husband's bidding and accompanied the two men as they followed Vestal out of town.

This court has held that even when named co-conspirators are acquitted, a person can be convicted of conspiring with unnamed individuals as long as the indictment refers to these individuals and the evidence supports their complicity. United States v. Price, 869 F.2d 801, 805 (5th Cir.1989). It is also clear that "private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute." United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970).

## IV.

The defendant argues next that the district court erred in its investigation of juror misconduct by failing to allow him to question the jurors or by failing to conduct its own voir dire. He relies on United States v. Phillips, 664 F.2d 971 (5th Cir.), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1981), for the proposition that "any off-the-record contact with a jury is presumptively prejudicial and the Government bears a heavy burden of proving that such contact did not affect the jury; if the Government cannot meet this burden, a new trial is required." He argues that the government failed to carry its burden and that the district court effectively shifted the burden to him. We review the district court's decision not to grant a new trial for an abuse of discretion. United States v. Sedigh, 658 F.2d 1010, 1014 (5th Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982).

■ The defendant's argument is without merit. The district court here followed established procedure for addressing allegations of juror misconduct. This court has held that "the trial court should investigate the asserted impropriety to determine initially if and what extrinsic factual matter was disclosed to the jury." Sedigh, 658 F.2d at 1014. When the allegations remain speculative, the trial court need not inquire further. Id.

---

**3.** This court recently stated that the consistency rule—"essentially giving the defendant the 'benefit' of inconsistent verdicts as to other defendants (or counts)—is of highly questionable validity in light of United States v. Powell, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)." United States v. Villasenor, 894 F.2d 1422, 1428 n. 6 (5th Cir.1990). Powell, while not a conspiracy case, held that verdicts should not generally be subject to challenge on the ground that they are internally inconsistent. See Powell, 469 U.S. at 65, 105 S.Ct. at 476–77 ("For us, the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest.") Several other circuits since Powell have abandoned the consistency rule in the conspiracy context or at least expressed their disapproval of the rule. See United States v. Bucuvalas, 909 F.2d 593 (1st Cir. 1990); United States v. Andrews, 850 F.2d 1557, 1560–62 (11th Cir.1988) (en banc), cert. denied, 488 U.S. 1032, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989); United States v. Valles–Valencia, 823 F.2d 381, 382 (9th Cir.1987).

The district court in this case held a hearing at which the juror's daughter and the lawyer with whom she spoke testified. The juror's daughter testified that although her father had expressed uncertainty as to whether the crime of conspiracy required that both co-conspirators be convicted, she did not express any opinion on the matter. When she asked a lawyer about it, he told her that any communication with a juror on such issues was improper, and the juror's daughter had no further contact with the juror until after the verdict was rendered. The district court found that this testimony indicated beyond a reasonable doubt that extrinsic evidence was not disclosed to the jury. Consequently, further investigation was not required. The district court acted in accordance with standard procedures and did not abuse its discretion.

It is true that if the defendant had been able to demonstrate as a threshold matter that improper communication of extrinsic information had likely occurred, further investigation might have been required. *See United States v. Forrest,* 620 F.2d 446, 457–58 (5th Cir.1980) (describing a two-part process under which voir dire is required upon a threshold showing of likely communication of extrinsic material). However in this case, the district court found that no extrinsic information had reached the jury.

Contrary to defendant's assertions, it is not sufficient to trigger the requirement of further investigation that a juror have had contact with an outside source of information. Rather, the defendant must show "that extraneous prejudicial material had likely reached the jury." *Forrest,* 620 F.2d at 458. This showing was not made in the present case.

## V.

Finally, the defendant argues that several sentences in the jury instructions were misleading. The standard for their review is " 'whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Stacey,* 896 F.2d 75, 77 (5th Cir. 1990) (citations omitted).

Defendant's objections to the length and repetition in the jury instructions are without merit. Evaluated as a whole, the court's instructions stated the law.

AFFIRMED.